UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. S2-4:08 CR 701 CAS |
| | ) | DDN |
| KAREN COLEMAN, | ) | |
| JAMES KORNHARDT, and | ) | |
| STEVEN MUELLER, | ) | |
| | ) | |
| Defendants. | ) | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE
<u>REGARDING EVIDENTIARY MOTIONS</u>**

This action is before the court upon the pretrial motions of the parties which were referred to the undersigned Magistrate Judge under 28 U.S.C. § 636(b). Hearings were held on August 28 and November 3, 2009. Transcripts of the proceedings were filed (Docs. 137, 149). The parties requested and were granted post-hearing briefing.

On November 3, 2009, the court took up the motions of defendant Steven Mueller to suppress (Doc. 77 oral motion) and to suppress evidence and statements (Doc. 113). Following the receipt of evidence, the court makes the following findings of fact and conclusions of law:

**<u>FACTS</u>**

December 19, 2008

1. During February 2009 Federal Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) Special Agent Theodore J. Heitzler first came across the name of Steven Mueller in the investigation of the October 22, 1992 murder of Danny Harold Coleman. He encountered Mueller's name after he reviewed a recorded December 19, 2008 telephone call made by defendant James Kornhardt. Kornhardt made the telephone call while detained at the St. Louis County Justice Center. In that call, Kornhardt spoke with his wife, his three daughters, and someone named Steve, all of whom (other than Kornhardt) were at Kornhardt's residence in Dittmer, Missouri. In the call, Kornhardt told Steve to remove some items from the residence. Heitzler was able to identify

Steve as Steven Mueller by the cell phone number[1] Steve gave to Kornhardt in the phone call.

February 24, 2009

2. Later in February, after Federal Bureau of Investigation Task Force Officers Jeffrey Roediger and Paul Neske contacted Mueller's family and left a calling card, Mueller called Roediger back. They arranged to meet, and did meet, in person on February 19, 2009 at which time TFO Roediger served Mueller with a federal grand jury subpoena. Thereafter, Mueller and the investigators spoke by phone on three occasions and met on February 24 at a Home Depot store parking lot. They arranged to meet again the next day.

3. At approximately 6:45 a.m., TFO Roediger and Mueller met on February 24, 2009, at a Home Depot store parking lot in South St. Louis County. The purpose of the meeting was to find out from Mueller what he removed from Kornhardt's residence. TFO Roediger and Agent Heitzler drove onto the parking lot in a truck. Mueller drove onto the parking lot in his own brown van. Mueller and Roediger parked their vehicles next to one another, Mueller and the agents got out, met between the two parked vehicles, and spoke. During their conversation, Heitzler told Mueller that he could leave if he wanted to, but that they would really like to get some information from him. At that time the investigators considered Mueller merely a witness. They did not advise Mueller of his constitutional rights to remain silent and to counsel. Roediger asked Mueller whether he would submit to a polygraph examination and Mueller answered in the affirmative. So, they arranged for Mueller to come to the ATF office in St. Louis on February 26, 2009, to take the polygraph test. Mueller had not been required to go to the parking lot meeting, he was not required to stay and talk with the agent, he could have left at any time, he was not required to agree to take this test, and he was not placed under arrest. The meeting lasted 40 minutes and then Mueller got back into his vehicle and drove away.

---

[1]The telephone company responded to an investigative subpoena with the identity of the subscriber of the telephone number.

February 24, 2009

4.  Later on February 24, Mueller telephoned Roediger and told him that he had not told Roediger the whole truth about the Coleman murder.

February 26, 2009

5.  On February 26, 2009 TFO Roediger picked up Mueller and drove him to the ATF office, because Mueller would have found it difficult to park near the office, had he driven his own vehicle. Mueller did not object to being driven to the ATF office. They got to the office about 10:10 a.m.

6.  At the ATF office, Mueller submitted to a polygraph examination by ATF Special Agent Michael Johnson, a polygraph examiner. First, Agent Johnson gave Mueller an ATF Advise of Rights and Waiver form, Government Exhibit SM-1. The subject's rights[2] were printed at the top of the form. These rights were read to Mueller by TFO Johnson. Johnson placed a checkmark at each rights statement as he read it to Mueller. The bottom part of the form contained a waiver statement,[3] which Mueller read. Johnson then asked Mueller whether he had any questions and Mueller indicated he had none. Then, at 10:40 a.m.

---

[2]
> You have the right to remain silent.
> Anything you say can be used against you in court.
> You have the right to talk to a lawyer before we ask you any questions and to have a lawyer with you during questioning.
> If you cannot afford a lawyer, one will be appointed for you if you wish before any questioning begins.
> If you decide to answer any questions now without a lawyer present, you have the right to stop answering at any time.

Gov. Ex. SM-1.

[3]
> Waiver
> I have read this statement of my rights or it has been read to me, and I understand these rights. At this time I am willing to answer questions without a lawyer present. No promises or threats have been made to me, and no pressure or force of any kind has been used against me.

Gov. Ex. SM-1.

Mueller and Johnson signed the form, whereby Mueller expressly waived his rights.

   7.   At that time, Mueller was a man of mature age, in his mid to late 40's. Mueller appeared to have normal intelligence. He did not appear intoxicated by alcohol or drugs. No threats or promises or intimidation were applied to Mueller to get him to cooperate. Instead, he was free to leave at any time. However, he appeared to want to cooperate and talk to the agents.

   8.   Next, Special Agent Johnson interviewed Mueller and conducted the polygraph examination. Johnson placed electronic sensor equipment on Mueller to measure his physiological responses to questions and his answers. Mueller was asked about the events of December 19, 2008, including the telephone call and what Mueller did after that. Mueller made statements in response to the questions. The polygraph examination took a couple of hours. When the examination was over, Johnson told Mueller that he had failed the polygraph examination because deception was detected.

   9.   After the polygraph examination, Mueller ate lunch. At approximately 2:30 p.m., Mueller was interviewed in the ATF office. He was asked questions and he answered them. He admitted he removed a revolver, a silencer, and ammunition from behind wallboard material in the garage detached from Kornhardt's residence. He said he took these things and threw them off the Jefferson Barracks Bridge over the Mississippi River in South St. Louis County, all on December 19, 2008. Mueller also told Agent Johnson that he had first-hand knowledge about the murder of Danny Coleman. Mueller drew a map of where Coleman's body and his truck were found. He also made a drawing of the silencer device used on the firearm. Mueller said he was concerned he could get into trouble for getting rid of evidence and failing the polygraph examination. The officers told Mueller that, if he told them the truth about what he took out of the garage, he would not be charged with that. They asked him whether he would be willing to continue cooperating, including identifying the field where Coleman's body and truck were hidden and with the events at the Jefferson Barracks Bridge. Mueller was very cooperative. He said he wanted to clean up what he had said

and help the investigation.

     10.  Mueller also gave a handwritten statement of what he had told Agent Johnson. During this interview he was not under arrest or being detained. No threats were made to get him to cooperate. Mueller could have left if he wanted. After the February 26 interview ended, Mueller agreed to meet with the agents the next day. He was returned to his car and he drove away.

                         February 27, 2009
     11.  On February 27, 2009 Mueller met with Agent Heitzler and Task Force Officer Roediger. Roediger picked up Mueller at the Home Depot store parking lot at approximately 9:30 a.m. The three drove in the investigators' car so that Mueller could show them the field and the bridge locations. However, before they drove away, Agent Heitzler told Mueller, "You know, you don't need to do this." Mueller said, "No, I want to clear the air. I've been living with this for 17 years." Heitzler then orally advised Mueller of his constitutional rights to remain silent and to counsel. When he finished, Heitzler asked Mueller whether he understood his rights. Mueller said, "Yes." Heitzler asked Mueller whether he still wanted to help in the investigation and Mueller said, "Yes." Mueller remained very cooperative. He never objected or said he did not want to help the investigation.

     12.  Next, the agents and Mueller drove south on Interstate 44 to the Stanton, Missouri exit and drove to a bar called Roosters. There they met with Franklin County Prosecuting Attorney's Office Investigator James Schumaker. Schumaker was there to aid the investigation by photographing the places Mueller pointed out. Mueller knew he would be photographed. The two agents and Mueller drove, with Schumaker following in his vehicle, to the field Mueller said was where Coleman's body and truck were found on October 22, 1992.

     13.  There, Mueller re-enacted the events of October 22, 1992, with Investigator Schumaker photographing him. When they finished at the field, Mueller directed them to the Jefferson Barracks Bridge and he showed them where he stood when he got rid of the firearm, silencer, and ammunition he had taken from Kornhardt's residence on December 19,

2008. While there, Mueller also spoke about the events of October 22, 1992. He directed the officers to areas where he disposed of other items. Ultimately, he was returned to his car around 12:30 p.m. and he drove away.

## March 4, 2009

14. On March 4, 2009, the day Mueller was subpoenaed to appear before the federal grand jury, Agent Heitzler picked up Mueller and drove him to the federal courthouse where he was interviewed in the United States Attorney's Office. There, before his grand jury appearance, Mueller was orally advised of his constitutional rights to remain silent and to counsel. Mueller said he understood his rights, and he agreed to waive his rights and speak with the agents without a lawyer present. During this interview, Mueller was very cooperative. He never indicated he wanted to stop cooperating or to leave.

15. However, during this interview, Mueller told the agents that he had received a telephone call from Diane Kornhardt, James Kornhardt's wife. She gave Mueller a phone number of a lawyer to call. Then, Mueller telephoned the lawyer. After the call Mueller told the agents that the lawyer told him he could invoke his Fifth Amendment right to not say anything to them. However, Mueller also told the agents that he did not want a lawyer, but wanted to continue cooperating with them. Mueller also told them more about the October 22, 1992 Coleman murder and of his telephone conversation with Kornhardt on December 19, 2008. Mueller agreed to give them a letter Kornhardt had written to him. Mueller also gave them photos of cars, including the one he drove in 1992.

16. Mueller was then taken before the federal grand jury. In front of the grand jury, he was again advised of his rights to remain silent and to counsel. Mueller then testified before the grand jury.[4]

17. After his grand jury testimony, Mueller went to the cafeteria in the federal courthouse where he ate. The agents told Mueller that

---

[4]The undersigned has reviewed the transcript of Mueller's grand jury testimony. Mueller appeared to be very cooperative and open in his testimony. (Gov. Ex. SM-8.)

they would meet in two or three weeks to continue the investigation, so that he could think about what had happened. The agents then returned him to his vehicle and he left.

March 31, 2009

18. On March 30, 2009, Mueller agreed to meet with investigators at the St. Louis County Police Department Third Precinct station the next day. On March 31, Mueller drove himself to the station for the meeting. There, before the meeting, Mueller was orally advised of his constitutional rights to remain silent and to counsel. Mueller said he understood his rights and agreed to speak to them. Mueller was given a written advise and waiver of rights form, Government Exhibit SM-3, identical to the one he reviewed and signed on February 26, 2009. Agent Heitzler read the form to him. After each statement of a right, Heitzler wrote his initials by the statement. Heitzler also read the waiver paragraph to Mueller, he asked Mueller whether he had any question about it, Mueller answered "No," and Mueller signed the form, expressly waiving his rights. Agent Heitzler and FBI Special Agent Mark Wood also signed the form as witnesses, at 10:35 a.m. on March 31, 2009.

19. Thereafter, Mueller was interviewed. He was asked questions and made statements. During the interview Mueller appeared to understand what he was doing. He remained cooperative and raised no concerns about cooperating. He was asked to submit to another polygraph examination about the Coleman murder. He agreed to do so, saying he wanted to clear up the earlier polygraph examination results. He agreed to take the polygraph examination the next day.

April 1, 2009

20. On April 1, 2009, TFO Roediger met Mueller and drove him to the ATF office in St. Louis, arriving after 10:00 a.m. Mueller was not then under arrest or in custody and he was free to leave. At the ATF office Special Agent Johnson met Mueller for a second polygraph examination.

21. Before the polygraph examination, Mueller was given another advice and waiver of rights form, Government Exhibit SM-4, identical to

the forms he had reviewed and signed previously. Mueller read the form, he understood the rights and the waiver language, and he signed the form at 10:35 a.m., thereby expressly waiving his constitutional rights to remain silent and to counsel. Mueller appeared to be very cooperative with the investigators and he wanted to help them in the Coleman murder investigation.

22. Next, Mueller was given another polygraph examination by Agent Johnson, which lasted approximately two hours. During the exam, Johnson asked Mueller questions about the Coleman murder and Mueller answered them. At the end of the examination, it was determined that Mueller failed the examination because deception was detected.

23. Approximately 45 minutes after the polygraph examination, Mueller was interviewed. He was asked questions about the Coleman murder and answered them. Mueller handwrote a statement of what happened, including the location of where Coleman was killed. Mueller offered to show the investigators where the place was and they agreed to go there the next day, April 2, during daylight hours to give Mueller a better opportunity to identify the place. The interview lasted four to five hours, until approximately 7:30 p.m.

24. Mueller was then told he was being placed under arrest, pending the filing of a federal criminal complaint. Mueller was taken to the St. Louis County Justice Center for incarceration. No questions were asked of him during the drive to the jail. However, he requested and received an opportunity to call his parents. He spoke with his mother. He then told the agents that he was fearful about his and his family's safety because of his cooperation with law enforcement authorities. As a result, Officer Roediger arranged for the St. Louis County Police to specially patrol his parents' residence. At the jail, Mueller was not placed in the general prisoner population, because James Kornhardt was also being jailed there.

April 2, 2009

25. On April 2, 2009, Agent Heitzler met with Mueller. He gave Mueller a printed advice and waiver of rights form, Government Exhibit SM-6, which was identical to the forms he had reviewed and signed

previously.  Heitzler reviewed the form with Mueller.  Mueller signed the form at 10:57 a.m., thereby expressly waiving his rights to remain silent and to counsel.  Even though he was then in custody, Mueller was still being cooperative with the investigators.  He understood what he was doing and said he wanted to cooperate.  At that time, Mueller knew that a federal complaint was being filed against him.

26.  At that time, Mueller was told he had the right to be taken promptly before a federal magistrate judge in connection with the criminal complaint.  Mueller was also told he could waive that right and continue meeting with the investigators and assisting in the investigation.  Mueller said he wanted to continue cooperating with the investigators.  He was then given another written form, one that described his right to prompt presentment to a magistrate judge, Government Exhibit SM-7.  The form contained the following statements and Mueller signed his name and wrote his initials next to each of the rights' statements to indicate that he understood them:

<u>Waiver of Prompt Presentment Before a United States Magistrate Judge</u>

> I, __/s/ Steven Mueller__, understand that I have the right [to] be brought before and appear before a magistrate judge without unnecessary delay following my arrest as set forth in Federal Rule of Criminal Procedure 5.  Fully understanding this right, I hereby waive that right.  __/sm/__ (initials)

<u>Consent to Travel With Law Enforcement Officials Following Arrest</u>

> I, __/s/ Steven Mueller__, hereby grant my consent to __/SA Theodore J. Heitzler/__, __/SA R. Mark Wood/__, and __/TFD Jeff Roediger/__, who are members of the federal law enforcement agencies, to take my person in a law enforcement vehicle for the purposes of identifying the location or locations where criminal activity has occurred and providing further information regarding the facts and circumstances surrounding criminal activity that occurred to which I have personal knowledge.  __/sm/__ (initials)
>
> I understand that I have the right to refuse to consent to the travel described above.  __/sm/__ (initials)
>
> I understand that I have the right to refuse to sign this form.  __/sm/__ (initials)
>
> I further state that no promises, threats, force or physical or mental coercion of any kind whatsoever have been used against me to get me to consent to the travel described above or to sign this form.  __/sm/__ (initials)

> It is my belief that my assistance to law enforcement officials at this time and in this regard is in my best interests. __/sm/__ (initials)

(Gov. Ex. SM-7.) Each of the rights was explained to him and Mueller had no question about them. He knew what he was doing. He never retracted or withheld his consent to cooperate in the investigation of the Coleman murder. Mueller signed the form at 11:03 a.m.

    27. Next, Mueller guided the investigators as they all drove to the locations that related to the Coleman murder. He also drew a diagram of the house and the location in the house where Coleman was killed.

    28. Following the conclusion of the interview and the exercise with Mueller, Mueller was taken to the federal courthouse in St. Louis for processing on the complaint.

### April 8, 2009

    29. On April 8, 2009, a federal search warrant was issued for the murder scene location which Mueller had identified. At the request of law enforcement, Mueller agreed to accompany the agents in the execution of the search warrant. Mueller's attorney was also present at that time. When the search was over, Mueller was returned to the custody of the Marshals Service.

### April 17, 2009

    30. On April 17, 2009, Mueller and his counsel met with Special Agent Heitzler and members of the United States Attorney's Office. The purpose of the meeting was to review information Mueller had provided law enforcement during its investigation of the Coleman murder. During this meeting, Mueller made statements.

### **DISCUSSION**

    Only his statements to law enforcement were the subjects of defendant Mueller's motions to suppress. The undersigned recommends that the motions to suppress be denied.

    The Fifth Amendment to the Constitution protects an individual from

being "compelled in any criminal case to be a witness against himself. . . ." U.S. Const. amend. V. To safeguard an individual's Fifth Amendment rights, a suspect in custody must be warned, before being interrogated, that he has the right to remain silent and that any statement he makes may be used against him. Miranda v. Arizona, 384 U.S. 436, 444 (1966). In Miranda, the Supreme Court concluded that the inherently coercive nature of custodial interrogations blurred the line between voluntary and involuntary statements, heightening the risk that an individual would be deprived of the Fifth Amendment's protections. Dickerson v. United States, 530 U.S. 428, 435 (2000). The procedural safeguards prescribed by Miranda only apply to persons who are subjected to interrogation and who are in custody. Oregon v. Mathiason, 429 U.S. 492, 494-95 (1977) (per curiam). The simple fact that an investigation has focused on a particular suspect does not implicate Miranda if the settings are noncustodial. Minnesota v. Murphy, 465 U.S. 420, 431 (1984).

**Statements on February 24, 2009.**

Mueller met with law enforcement officers on February 24, 2009, and made statements during this meeting. At the time, the officers did not advise Mueller of his Miranda rights.

During the meeting, the officers did not employ any strong-arm tactics. The officers informed Mueller that he was free to leave, and Mueller could have left at any time. Indeed, once the meeting concluded, Mueller was not placed under arrest, and he simply drove off. Under the circumstances, Mueller was not in custody during this meeting. See United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990) (listing factors to consider in conducting custody analysis). Looking to Mathiason, the officers were not required to advise Mueller of his Miranda rights. His statements during this meeting should not be suppressed.

**Statements on February 26, February 27, March 4, March 31, April 1, and April 2, 2009.**

Mueller met with law enforcement officers and made statements on

-11-

each of these dates.  Yet, before making any statements, the officers advised Mueller of his <u>Miranda</u> rights on each separate occasion.  His statements therefore constituted a waiver of his rights.  <u>See</u> <u>North Carolina v. Butler</u>, 441 U.S. 369, 372-76 (1979).  Statements made after a knowing and voluntary waiver of <u>Miranda</u> rights are admissible unless there were earlier, unwarned statements resulting from coercion or a calculated effort to undermine the suspect's free will.  <u>United States v. Briones</u>, 390 F.3d 610, 614 (8th Cir. 2004).

On each occasion, Mueller agreed to cooperate with law enforcement. He indicated a willingness to proceed with questioning, stemming from a desire to "clear the air," or clear-up earlier statements.  Mueller appeared to have normal intelligence and to be of a mature age.  He never appeared intoxicated or impaired.  There is no evidence that the officers ever coerced Mueller's participation through the use of threats, promises, or intimidation.  All of Mueller's statements on each of these dates were made voluntarily and responsively, and came after Mueller had been informed of his constitutional rights to remain silent and to have counsel present.  All of Mueller's statements on these dates should not be suppressed.

**Statements of April 8 and April 17, 2009**

Mueller met with law enforcement officials on these two days, and again made statements.  On each occasion, Mueller's attorney was present at the time he made the statements.

The presence of counsel serves as the "adequate protective device necessary to make the process of police interrogation conform to the dictates of the privilege [against self-incrimination]."  <u>Miranda</u>, 384 U.S. at 466.  Because counsel was present on these two days, there was no <u>Miranda</u> violation, and Mueller's statements should not be suppressed.

**RECOMMENDATION**

For the reasons stated above,

**IT IS HEREBY RECOMMENDED** that the motions of Steven Mueller to suppress (Doc. 77 oral motion) and to suppress evidence and statements (Doc. 113) be denied.

The parties have until January 13, 2010 to file documentary objections to this Report and Recommendation. The failure to file timely documentary objections may waive the right to appeal issues of fact.

/S/ David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on December 30, 2009.